**ROBB EVANS and ROBB EVANS & ASSOCIATES LLC**
Temporary Receiver of
**FORTUNE HI-TECH MARKETING, INC.**
**FHTM, INC.**
**ALAN CLARK HOLDINGS, LLC**
**FHTM CANADA, INC.**
**FORTUNE NETWORK MARKETING (UK) LIMITED**

**REPORT OF TEMPORARY RECEIVER'S ACTIVITIES**
January 24, 2013 through February 19, 2013

This report covers the activities of the Temporary Receiver[1] since the inception of the temporary receivership. This is the first Report to the Court on the progress of the temporary receivership. It does not constitute an audit of financial condition and is intended only to provide information for use by the Court in assessing the progress of the temporary receivership.

## Overview

In addition to providing financial details from January 1, 2009 through December 31, 2012 of the Receivership Defendants' activities, this report will discuss and provide detailed information about the results of Fortune Hi-Tech Marketing, Inc.'s compensation program. At least from 2009 through 2011, more than 81% of commissions paid to the Independent Representatives were recruiting bonuses for recruitment of new participants. In 2012, recruiting bonuses were about 62% of total commissions.

During 2009 to 2012, approximately 98% of the Independent Representatives received less than $1,000 of commissions per year while an average of 74.4% of the Independent Representatives earned less than $10.00 per year. More than 88% of the Independent Representatives did not earn more than the enrollment fees to recoup their initial investments. Conversely, less than 0.1%, or an average of 39 of the Independent Representatives, received more than $100,000 in net commissions per year. The results also show a very high dropout rate of new participants. From 2009 to 2011, more than 94% of the Independent Representatives did not renew their positions after their initial year.

Fortune Hi-Tech Marketing, Inc. and Alan Clark Holdings, LLC paid a total of $41.3 million in dividends to their shareholders from inception through January 2013. These two companies also paid approximately $7.5 million in salary to their shareholders from 2007 to 2012. Of these amounts, Paul Orberson and Thomas Mills received a total of $21.2 million

---

[1] Reference to the Temporary Receiver in this report means the Temporary Receiver, the Temporary Receiver's deputies, its staff, and its counsel.

Page 1 of 14

and $18.1 million, respectively, in dividends and salary. Other shareholders, many of whom appear to be family members of either Mr. Orberson or Mr. Mills, received approximately $9.5 million in dividends and salary.

## Custody, Control and Possession

On January 28, 2013 the Temporary Receiver entered the business premises located at 880 Corporate Drive, Lexington, Kentucky and a warehouse facility located at 20 Gose Pike, Danville, Kentucky. The Temporary Receiver secured the premises by changing the locks and took custody, control, and possession of all assets and documents on the business premises. The Temporary Receiver completed a photographic inventory of receivership assets and interviewed employees.

The Temporary Receiver met with and solicited cooperation from individual defendants, Mr. Paul C. Orberson and Mr. Thomas A. Mills. Mr. Orberson and Mr. Mills cooperated with the Temporary Receiver and instructed the company management and key employees to cooperate with the Temporary Receiver.

Mr. Orberson introduced the Temporary Receiver to the Vice President of Operations for Canada. The Temporary Receiver informed the Vice President of Operations that operations were suspended and no recruitment or product sales were authorized. The Temporary Receiver did authorize a limited shipment of a few products that had been paid for.

## Communications with Representatives

The company had a pre-arranged conference call with its senior sales representatives scheduled to take place at 11:00 a.m. EST on January 28th. Mr. Orberson informed approximately 425 participants on the call of the lawsuit filed by the Plaintiffs. The Temporary Receiver participated in the call and made the following points:

- A Complaint was filed by the Federal Trade Commission, the Commonwealth of Kentucky, and the states of North Carolina and Illinois.
- The complaint alleges that Fortune Hi-Tech Marketing is operating an illegal pyramid scheme and it is also accused of misrepresentations.
- The US District Court issued a Temporary Restraining Order and appointed Robb Evans and Robb Evans & Associates LLC as Temporary Receiver.
- As part of its duty to evaluate whether the company can be operated lawfully and profitably, the Temporary Receiver suspended operations while performing that review. While operations are suspended there will not be any shipments or collection of fees or charges.

- The US District Court has scheduled a hearing on February 7 where one of three outcomes may occur: the Temporary Restraining Order could be dissolved, or it could be extended, or it could be replaced with a Preliminary Injunction.

Mr. Orberson worked with the Temporary Receiver to develop a written communication for the purpose of emailing that written communication to all active representatives and notifying the representatives of the lawsuit filed by the Plaintiffs. On January 28th approximately 45,000 representatives were sent a broadcast email informing them of the lawsuit.

The company maintained and operated 20 websites. On January 28th the Temporary Receiver worked with the company's information technology staff and all of these websites were disabled and redirected to the Temporary Receiver's website. The Temporary Receiver's website contains copies of this Court's Temporary Restraining Order, other documents filed with this Court and a Notice to Representatives and Consumers (Tab 1).

## Financial Information

Fortune Hi-Tech Marketing Inc., FHTM Inc., FHTM Canada Inc., Fortune Network Marketing (UK) Limited (collectively, "FHTM") and Alan Clark Holdings, LLC ("Alan Clark") have operated as a common enterprise conducting the multi-level marketing business, selling various products and services using a network of independent representatives. The Temporary Receiver interviewed the Chief Analytics Officer, the Comptroller, and the Information Technology Director and reviewed financial records and other data with them. These company officers provided many detailed reports, data, and other information requested by the Temporary Receiver. All of the data discussed in this section of the report was obtained by the Temporary Receiver from the Receivership Defendants.

## Balance Sheets

Under Tab 2 are balance sheets for FHTM and Alan Clark. The table below summarizes the total assets, liabilities, and equity of FHTM and Alan Clark as of December 31, 2012.

|  | FHTM | Alan Clark |
|---|---|---|
| Total Assets | $  4,525,128 | $1,053,234 |
| | | |
| Total Liabilities | $  3,240,254 | $   92,392 |
| Total Equity | 1,284,874 | 960,842 |
| Total Liabilities & Equity | $  4,525,128 | $1,053,234 |

At December 31, 2012 FHTM's balance sheet lists an inventory value of approximately $2.1 million. The Temporary Receiver was advised by company management that the inventory value is overstated; however, the Temporary Receiver has not yet determined the amount by which the inventory may be overstated. A summary of the inventory is as follows:

| Description | Costs Per Books |
|---|---|
| True Essential Products | $  1,127,416.28 |
| Envy Beauty Products | 532,151.28 |
| Literature | 65,036.14 |
| Promotional Products | 47,691.44 |
| Sign Ups/Manager Kit | 15,966.80 |
| Other | 3.00 |
| Inventory stored in Danville | $  1,788,264.94 |
| Inventory stored in Canada | 291,768.16 |
| Total Per Books | $  2,080,033.10 |

Fixed assets consisting of furniture, fixtures, and computer equipment are valued at $373,751.

FHTM's balance sheet shows a total of $800,906 in receivables as of December 31, 2012, which includes approximately $565,000 in merchant reserve accounts, and $201,000 in credit card receivables.

FHTM's balance sheet lists total liabilities of about $3.2 million. Of that amount approximately $1.5 million was commissions and bonuses payable to Representatives. Deferred income of approximately $682,000 consists of deferred revenue for wireless phone and security alarm products, which are amortized two or three years. Other liability of about $688,000 consists of miscellaneous accrued expenses.

At December 31, 2012 Alan Clark's balance sheet lists total assets of $1,053,234. Land and buildings of approximately $800,000 are the largest fixed assets, which is the warehouse located at 20 Gose Pike, Danville, Kentucky.

## Revenue

FHTM sells health and beauty products, and other products and services offered by FHTM and provided by third-party companies. The revenues generated from the sales of FHTM's own products and services are recorded as sales or bundle sales on the books. For the sales of products and services provided by third-party companies, the Receivership Defendants received commissions which were recorded as revenue[2] on the books of either FHTM or Alan Clark. A majority of the commissions received from third-party companies are first recorded on Alan Clark's books. Alan Clark would retain a certain portion of the profits and then transfer the remaining commission revenue to FHTM, which are recorded as cost of goods sold on Alan Clark's books.

Total revenue from sales and commissions received from January 1, 2009 to December 31, 2012 is summarized below.

| | 2012 | 2011 | 2010 | 2009 | Total |
|---|---|---|---|---|---|
| IR & IR Renewal Fees | $ 6,592,380 | $ 9,326,442 | $ 22,986,408 | $ 27,762,738 | $ 66,667,968 |
| Sales | 8,956,077 | 14,039,522 | 27,995,183 | 25,742,634 | 76,733,416 |
| Bundle Sales | 18,373,917 | 28,594,282 | 16,181,237 | - | 63,149,436 |
| Total Sales | $ 33,922,374 | $ 51,960,246 | $ 67,162,828 | $ 53,505,372 | $ 206,550,820 |
| Commissions | 4,615,385 | 7,287,253 | 11,428,839 | 9,529,406 | 32,860,883 |
| Revenue on FHTM Books | $ 38,537,759 | $ 59,247,499 | $ 78,591,667 | $ 63,034,778 | $ 239,411,703 |
| Gross Profit on Commissions | | | | | |
| Retained by Alan Clark | 1,793,201 | 2,071,779 | 5,249,972 | 3,656,110 | 12,771,062 |
| Total Revenue | $ 40,330,960 | $ 61,319,278 | $ 83,841,639 | $ 66,690,888 | $ 252,182,765 |

Note: "Gross Profit" is a term used by Alan Clark and represents "Commissions Receivable" less "Commissions Paid to FHTM".

## Independent Representative Fees

All FHTM enrollees are classified as Independent Representatives ("IR"). According to FHTM's compensation plan, an IR who has paid an enrollment fee is initially classified as a Manager. In most cases an annual renewal fee is required. These fees are recorded as IR Fees and IR Renewal Fees under Sales.

---

[2] Although the title of the Alan Clark general ledger account is Commissions Receivable, this is, in fact, revenue and not accounts receivable.

The IR Fee and IR Renewal Fee changed several times between 2009 and 2012, and ranged from $99 to $299. During the same period, the IR Fees and IR Renewal Fees were 15.21% to 41.63% of the revenue generated by the Receivership Defendants as listed below.

|  | 2012 | 2011 | 2010 | 2009 | Total |
|---|---|---|---|---|---|
| Sales: IR Fees | $ 6,078,004 | $ 8,702,117 | $ 21,843,818 | $ 26,917,463 | $ 63,541,402 |
| Sales: Renewal Fees | 514,376 | 624,325 | 1,142,590 | 845,275 | 3,126,566 |
|  | $ 6,592,380 | $ 9,326,442 | $ 22,986,408 | $ 27,762,738 | $ 66,667,968 |
|  |  |  |  |  |  |
| Revenue - FHTM | $38,537,759 | $59,247,499 | $78,591,667 | $63,034,778 | $ 239,411,703 |
| Gross Profit on Commissions Retained by Alan Clark | 1,793,201 | 2,071,779 | 5,249,972 | 3,656,110 | 12,771,062 |
| Total Revenue | $40,330,960 | $61,319,278 | $83,841,639 | $66,690,888 | $252,182,765 |
|  |  |  |  |  |  |
| IR & Renewal Fees to Total Revenue | 16.35% | 15.21% | 27.42% | 41.63% | 26.44% |

The Temporary Receiver obtained an electronic file titled "Rep List" from the Receivership Defendants, which was downloaded from the system. The Temporary Receiver segregated the IR data from the United States and Canada. The Temporary Receiver further analyzed the data, including the sign-up date and the renewal date of each IR. FHTM's Policies & Procedures Manual states that each IR is required to renew his or her position annually and if the IR fails to renew he or she becomes inactive. Accordingly, the Temporary Receiver filtered the data by using these criteria to obtain the number of active IRs and new IRs throughout each year from 2009 to 2012 set forth below.

## Canada

| Year | Number of Active IRs | Number of New Enrollees | Failed to Renew After Initial Year | |
|---|---|---|---|---|
| 2009 | 22,940 | 12,787 | 12,246 | 95.77% |
| 2010 | 23,760 | 10,230 | 9,918 | 96.95% |
| 2011 | 21,018 | 9,980 | 9,737 | 97.57% |
| 2012 | 18,059 | 7,550 | Not yet subject to renewal | |

## United States

| Year | Number of Active IRs | Number of New Enrollees | Failed to Renew After Initial Year | |
|---|---|---|---|---|
| 2009 | 125,952 | 81,358 | 76,637 | 94.20% |
| 2010 | 182,667 | 97,323 | 93,611 | 96.19% |
| 2011 | 191,072 | 87,175 | 85,081 | 97.60% |
| 2012 | 141,201 | 47,667 | Not yet subject to renewal | |

The data above shows that a substantial number of IRs failed to renew and became inactive after their initial year. More than 94% of the participants did not renew their positions after their initial year for the period of 2009 to 2011.

As shown in the tables above, the number of IRs in Canada averaged 11.8% of all IRs during 2009 to 2012.

The analysis discussed below deals primarily with IRs in the United States. According to the analysis of the commissions paid to the IRs, more than 90% of the IRs earned less than their enrollment or annual fees paid from 2009 to 2012.

## Commissions Paid to United States IRs

FHTM's books show that the total commissions and bonuses paid to the IRs, before the reduction of administrative fees, were approximately $40.1 million in 2009, $44.1 million in 2010, $29.7 million in 2011, and $18.2 million in 2012.

The Temporary Receiver compared and reconciled the commissions paid data to FHTM's books, and certain variances were noted as shown under Tab 3. The Temporary Receiver asked the Chief Analytics Officer about these variances and was told that the commissions paid data was based on the actual commissions paid to the IRs, and the books are recorded on an accrual basis, including the amounts earned but unpaid to the IRs. Therefore, the Temporary Receiver relied on the downloaded data to perform further analysis.

### Composition of Commissions Paid

Commission terms used by FHTM include CAB Commissions, Other Commissions, Administrative Fees, and Net Commissions. CAB Commissions are commissions paid for a Customer Acquisition Bonus ("CAB") and represent bonuses paid for recruitment. According to the FHTM Compensation Plan, "the CAB is an up-front, lump-sum payment rewarding an IR for customers gathered by new IRs in the IR's business." Other Commissions include Customer Generated Usage ("CGU") payments, described as "a set amount or set percentage paid to IRs as established by FHTM based on sales of products and services, and described on www.FHTMCentral.com." Administrative Fees are the deductions from bonuses and commissions paid to IRs, including data processing fees and shipping fees. Net Commissions are the net amounts paid to each IR, calculated as the total of CAB Commissions and Other Commissions, less Administrative Fees charged to each IR.

The analysis performed by the Temporary Receiver under Tab 3 shows that a high percentage of the commissions paid were CAB Commissions, which were 90.39%, 86.96%, 81.36% and 62.16% of total commissions paid in 2009, 2010, 2011 and 2012, respectively. These results demonstrate that in 2009, 2010, and 2011, FHTM's compensation plan encouraged and rewarded recruitment far greater than product and service sales. It appears

the significant decline to 62.16% in 2012 was attributable to an increase in CGU payments resulting from an increase of CGU commission rates from 0.25% to 1% at the same time recruiting was dwindling dramatically.

## Analysis of Commissions for All Active IRs

The commissions paid data represents the population of IRs who earned $10.00 or more per year. For the IRs who earned less than $10.00, the amount was not paid or recorded as a liability.

The analysis shows that an average of 74.4% of the active IRs earned less than $10.00 per year between 2009 and 2012. Compared to the enrollment and renewal fees, which changed numerous times, ranging from $99 to $299 between 2009 and 2012, more than 88% of the IRs did not earn enough to recoup their enrollment fees in the FHTM program. (Tab 4)

The tables below summarize active IRs in the United States and Canada who earned commissions over $10.00 and under $10.00.

United States

| Year | Number of All Active IRs | Number of IRs Net Commissions over $10.00 | | Number of IRs Net Commissions under $10.00 | |
|------|------|------|------|------|------|
| 2009 | 125,952 | 43,893 | 34.85% | 82,059 | 65.15% |
| 2010 | 182,667 | 50,395 | 27.59% | 132,272 | 72.41% |
| 2011 | 191,072 | 40,939 | 21.43% | 150,133 | 78.57% |
| 2012 | 141,201 | 28,722 | 20.34% | 112,479 | 79.66% |
| Average | | | 25.58% | | 74.42% |

Canada

| Year | Number of All Active IRs | Number of IRs Net Commissions over $10.00 | | Number of IRs Net Commissions under $10.00 | |
|------|------|------|------|------|------|
| 2009 | 22,940 | 8,767 | 38.22% | 14,173 | 61.78% |
| 2010 | 23,760 | 7,381 | 31.06% | 16,379 | 68.94% |
| 2011 | 21,018 | 6,527 | 31.05% | 14,491 | 68.95% |
| 2012 | 18,059 | 4,971 | 27.53% | 13,088 | 72.47% |
| Average | | | 32.23% | | 67.77% |

Note: Number of Active IRs is based on the analysis of the "Rep List" data download. However, the number of IRs with Net Commissions is obtained separately from the Commissions Paid download. The number of IRs with net commissions under $10.00 is based on all active IRs, less the number of IRs with net commissions over $10.00.

## Stratification Analysis of Commissions Paid to IRs

As previously discussed, the commissions paid data only contains commissions over $10.00 paid to IRs, and the commissions under $10 were accumulated in the system but remained unpaid and unrecorded in the accounting records until the amounts reached $10.00.

An electronic file titled "Statement Carryovers Summary" provided by the Chief Analytics Officer shows these unrecorded amounts earned by the IRs total approximately $2.2 million and are unpaid.

The Temporary Receiver further stratified the data and analyzed the structure of the commissions paid. Under Tab 5(A), the stratification analysis for United States IRs shows a significant concentration of the commissions paid to the top levels and the vast majority earned very little. [3] More than 93% of the United States IRs received between $10.00 and $1,000 per year in commissions from 2009 to 2012, which represents less than 17% of the total commissions paid.

If the unpaid commissions under $10.00 are included in the calculation above, 98% of the United States IRs would have received commissions of $1,000 or less as illustrated below.

| Year | Active | Net Commissions under $10.00 | Net Commissions over $10.00 but under $1,000 | Net Commissions under $1,000 | % of Total Active IRs |
|------|--------|-------------------------------|-----------------------------------------------|-------------------------------|------------------------|
| 2009 | 125,952 | 82,059 | 41,374 | 123,433 | 98.00% |
| 2010 | 182,667 | 132,272 | 47,260 | 179,532 | 98.28% |
| 2011 | 191,072 | 150,133 | 38,852 | 188,985 | 98.91% |
| 2012 | 141,201 | 112,479 | 26,982 | 139,461 | 98.77% |

As shown in Tab 5(A), of the IRs who received greater than $10.00, only approximately 1% or an average of 408 of the IRs received more than $10,000 per year in net commissions from 2009 to 2012, which represents more than 62% of the total commissions paid. Additionally, less than 0.1%, or an average of 39 of these IRs, received more than $100,000 in net commissions per year during the same period.

If the unpaid commissions under $10.00 were included in the calculation above, 0.17% to 0.36% of the IRs would have received commissions of $10,000 or more per year and 0.02% to 0.04% of the IRs would have received more than $100,000 per year as illustrated below.

---

[3] In addition to the stratification analysis for United States IRs, Tab 5(B) includes a stratification analysis for Canadian IRs.

Page 9 of 14

|  | | Number of IRs | | | | |
|---|---|---|---|---|---|---|
| Year | Active | Net Commissions over $10,000 | % | Net Commissions over $100,000 | % |
| 2009 | 125,952 | 452 | 0.36% | 46 | 0.04% |
| 2010 | 182,667 | 522 | 0.29% | 47 | 0.03% |
| 2011 | 191,072 | 411 | 0.22% | 37 | 0.02% |
| 2012 | 141,201 | 246 | 0.17% | 26 | 0.02% |
| Average | 160,223 | 408 | 0.25% | 39 | 0.02% |

## Dividends Declared & Payroll Paid to Shareholders

According to the books and records, total retained earnings were approximately $31.2 million for FHTM and $12.4 million for Alan Clark as of December 31, 2012.

The books and records of FHTM and Alan Clark show payments from retained earnings in the form of dividends to the shareholders. FHTM and Alan Clark paid a total of $29.9 million and $11.4 million, respectively, to their shareholders from inception through January 2013, which represent approximately 95.9% and 92.3% of their total retained earnings, respectively. Out of $29.9 million, $15.95 million was paid by FHTM after January 1, 2009. Out of $11.4 million, $8.94 million was paid by Alan Clark after January 1, 2009.

In addition to the dividends paid, some of shareholders also received a significant amount of salary compensation. In particular, Thomas Mills received $2.85 million from 2007 to 2012, of which $1.97 million was received after January 1, 2009. Paul Orberson received $2.53 million from 2007 to 2012, of which $1.7 million was received after January 1, 2009.

The dividends and salary compensation paid prior to January 1, 2009 and thereafter are listed below. Under Tab 6 is the detailed summary of the dividends and salary compensation paid by year.

|  | Before 1/1/2009 | | | After 1/1/2009 | | | |
|  | FHTM Dividends | Alan Clark Dividends | FHTM Payroll | FHTM Dividends | Alan Clark Dividends | FHTM Payroll | Total |
|---|---|---|---|---|---|---|---|
| Paul Orberson | $ 7,222,597 | $ 753,000 | $ 831,427 | $ 8,054,750 | $ 2,680,500 | $ 1,697,927 | $ 21,240,201 |
| Thomas Mills | 6,076,595 | 502,000 | 875,699 | 6,938,250 | 1,787,000 | 1,970,442 | 18,149,986 |
| Shareholder#3 | 111,665 | 251,000 | 279,847 | 159,500 | 893,500 | $ 1,553,359 | 3,248,871 |
| Shareholder#4 | 558,323 | | | 797,500 | | | 1,355,823 |
| Shareholder#5 | | 251,000 | | | 893,500 | | 1,144,500 |
| Shareholder#6 | | 251,000 | 7,818 | | 893,500 | 202,278 | 1,354,596 |
| Shareholder#7 | | 251,000 | | | 893,500 | 46,523 | 1,191,023 |
| Shareholder#8 | | 251,000 | | | 893,500 | 4,211 | 1,148,711 |
| Total | $ 13,969,180 | $ 2,510,000 | $ 1,994,791 | $ 15,950,000 | $ 8,935,000 | $ 5,474,740 | $ 48,833,710 |

Note: The Temporary Receiver redacted the names of other shareholders, many of whom appear to be family members of either Mr. Orberson or Mr. Mills.

## Consumer Complaints

The Temporary Receiver conducted a detailed interview with the Director of Compliance. The Director of Compliance worked at FHTM for nine years and has served in that capacity since April, 2010. He supervised a staff of two, one of which quit one week prior to the entry of the Temporary Restraining Order. Among his duties are to respond to all Attorney General and Better Business Bureau complaints. The majority of his time is spent dealing with IR complaints and compliance with company policies. He described some of the typical issues involving the IRs as follows:

- IRs call to complain about an unexpected charge on their credit card
- IR makes a lifestyle or income claim to a prospective member
- Unauthorized use of logos, trademarks, or other intellectual property
- IR claims he did not sign up as a representative or didn't know about the recurring monthly charges

IRs who had a complaint lodged against them would receive a compliance letter referred to as a "10 Day Letter." IRs who failed to respond within the 10-day period faced possible termination.

When asked if he was aware of any cases where an IR was terminated for making an income or lifestyle claim, he stated that he was certain that some had been warned, but was not aware of any IR being terminated for making an income or lifestyle claim.

The Temporary Receiver reviewed 269 compliance files which contained 10 Day Letters that were sent to IRs starting in May 2010 through December 2012. The Temporary Receiver

noted the type of policy violation outlined in the warning letter for 36 of the most recent compliance files.  IR violations included claims of credit card fraud, bonus buying, use of a robo-dialer, defamation of the company, misuse of FHTM's intellectual property and income claims.  The most prevalent violation that resulted in a disciplinary action against an IR by the company was for cross recruiting.  Cross recruiting resulted when an IR decided to leave FHTM and attempted to persuade their downline IRs to follow them to the new company. Of the 36 compliance files, approximately 21 (58%) included allegations of cross recruiting.

The Temporary Receiver reviewed numerous consumer complaints that were found in filing cabinets in the Compliance Department, on fax machines, and in the incoming mail.  Most consumer complaints filed prior to January 2011 had been sent to the warehouse in Danville for storage.  The Temporary Receiver located 595 consumer complaints which were sent to the Receivership Defendants from January 2011 through January 2013.  The majority of the complaints also included refund requests.

The complaints under Tab 7[4] state in part the following:

*Complaint 1—January 29, 2013*

"I do not wish to join your organization at all and I believe I was misled completely."

*Complaint 2—January 24, 2013*

"I used all the money I had in my account to sign up because I believed that this program would truly work for me. … I was so angry with Mike…because never once did he tell me that I would have to make any purchases from the company!!!  I couldn't afford to have any revolving accounts!!  I couldn't even pay my bills as is!  He completely misrepresented how the program worked!"

*Complaint 3—April 27, 2012*

"You entice people to pay a fee to sign up, pay an exorbitant fee to purchase products to sell, but strongly emphasize the need to recruit more 'members' to make money."

*Complaint 4—May 24, 2012*

"The reason I am writing this letter to you all today is because we are very **UNHAPPY** with you all at this time.  My husband and I got into the business to try to make some extra money, but we haven't made any yet."

---

[4] The Temporary Receiver redacted consumer information contained in the complaints.

*Complaint 5—May 3, 2011*

"I was under the impression that it was about selling the product, but yet I keep getting told to bring people to sign up. …every time that I tried to sell product my uplink (Ronnie xxxx) would tell me not to worry about the product we need people is what he would tell me. He would tell me that is where the money is at."

*Complaint 6—May 16, 2011*

"When we were introduced to this program we were led to understand that our enrollment fee is a onetime fee and that we were not going to be required to buy product every month to meet qualifications. … The second reason being that we were led to believe that the products we ordered were [sic] come in cases for retail sale, not (as in our case) four bottles of product at $25.00 per bottle. In this area and in our income bracket no one would buy that high of product from us and we surely cannot afford that expensive of shampoo and cream rinse on our fixed income."

*Complaint 7—January 10, 2011*

"At that time, Thomas persuaded me to purchase a 'bundle.' I wrote my debit card number down on the back of a piece of paper he had been using during the session, and my address. I was told this would be a onetime only charge, and when I needed to buy more, to go online and order it. … Mr. Mills took my info on the back of that paper, and never even indicated to me what type of 'bundle' I would be receiving. I foolishly took his word on good faith, because he is involved with other people I know."

*Complaint 8—November 26, 2010*

"The DVD presentations of some of your "Stars" Todd Roland and others made the program look very attractive and that so many people were getting very wealthy using Fortune's method of marketing. … It did not take very long to realize that Fortune was a big 'hype' and that very few reps were making any money and most were not even getting back their investment."

It should be noted that some of the IRs whose complaints are set out above received refunds.

The issues raised in the remaining complaints covered a wide array of issues. One of the most common complaints was that the IR's sponsor did not disclose that the IR was required to buy product on a monthly basis to qualify for bonuses or that the IR's sponsor signed the IR up for a monthly recurring fee for products without the IR's knowledge or consent.

On February 6, 2013, the Temporary Receiver reviewed the website for the BBB in Lexington, Kentucky for Fortune Hi-Tech Marketing. The Receivership Defendant had an "F" rating from the BBB as a result of 78 consumer complaints that had been filed and government actions against the business.

## Bank Accounts

The Temporary Receiver served the Temporary Restraining Order on all known financial institutions and merchant processors that were used by the receivership defendants. Currently, the funds frozen in the receivership defendants' accounts total approximately $873,000. In addition, approximately $840,000 is held in merchant processing accounts that could be subject to future chargebacks. The Temporary Receiver is continuing to confirm the balances of bank accounts and merchant accounts of the receivership defendants, and working with other financial institutions and merchant processors concerning the turnover of funds.

## Stipulation Regarding *Ex Parte* Temporary Restraining Order dated February 7, 1013

Pursuant to Paragraph 3. (d), on February 8, 2013 the Temporary Receiver caused a broadcast email to be sent to approximately 45,000 IRs providing them a link to the Temporary Restraining Order.


Respectfully submitted,

/ s /

Robb Evans and Robb Evans & Associates LLC
Temporary Receiver